Trout v. Chalkie Majesty v. Waldo Page number 13, page 6484, page 13, page 6499. NCJ of Tarleton, C harmless carthouse and chuck v. Chalkie I'd like to reserve four minutes for rebuttal. Fine. Counsel, may it please the court. My name is Lane Seiske. I'm here for the appellants. As a matter of first impression in the Commonwealth of Kentucky, this court sitting in diversity must determine whether the Kentucky mining laws were meant to protect David McCarty, a visitor and independent contractor to Cobol's surface mine, and to prevent the harm that befell him while he was working from a step ladder installing a garage door. Without question, the outcome of this appeal is not just important to the estate and family of Mr. McCarty or to Cobol, but it's important to mines across the Commonwealth of Kentucky and to visitors and independent contractors working at those mines. The short answer is absolutely those Kentucky mining laws meant to protect Mr. McCarty. And the harm that befell him was... Weren't they meant to protect miners? Doing mining work? Well, of course, Kentucky's mining laws are meant to protect miners, but not exclusively. Doing miners work? Doing mining work or visitors and contractors that are exposed to mine hazards. And even though Mr. McCarty was installing a garage door and on a step ladder at the time he fell, what happened to him was a result of a hazard that was specific to Cobol's mine facility. What do you mean when you say that's specific to the mine facility? Because it occurred on the mine property or is it specific to mining? It's not just that it occurred on mine property. There could be something else such as if he was putting together lug nuts and with a garage door and something happened, that wouldn't be specific to the surface mine. That could have happened any place. But because he fell off the step ladder without being tied off, how to implement a fall prevention system and what would have been a suitable anchorage point for him to tie off and to use a wire or a guideline and lassos and D-rings had to be incorporated into the physical structure of the mine. That may be a safety feature to put the door on, but is it a mining... He's not doing any mining at the time. He's not in a mine. Well, he's not in a mine, but he's on the coal property in a surface mine and you're correct that, look, he's installing a garage door, but the hazard that befell him... Of which he must be the expert. He's the subcontractor that's doing this. That's not true in this case, Your Honor. There is no evidence before this court that Mr. McCarty had any training on how to safely implement a fall prevention system at that location. In fact, his supervisor... That's why you get workers' comp. Presumably, then, the employer didn't train their employee correctly. And that's why you get workers' compensation. But to say that everybody that contracts and has subcontractors that the owner of some property has to come out and cross-examine their ability to do their job seems well way off the scope to me. And I understand. And whether one would agree with it or not, sitting in diversity, this court is tasked with making the best prediction of what the Kentucky Supreme Court would do, even in the absence of direct precedent, if presented with this question. And if we look first at the plain language of the regulations and of the statutes, they specifically state that they apply to Mr. McCarty. If I could ask you a basic question. Sure. Does the record show what the building was going to be used for? Kind of a storage-type facility for equipment and things used in the mining process. This land was actually owned by the Commonwealth of Kentucky and was leased to the coal mine for mining purposes. And so if we look at the plain language of the regulation of hazard training, it specifically states that it applies to visitors of the mine. And there can be no question here that Mr.- I'm sorry? Which reg are we talking about? I'm sorry, Judge White. It's 805 KAR 7 colon 090. And this is the regulation that deals specifically with hazard training. And it says the administrative regulation in relevant part, regulation establishes a training program for visitors of a mine site. It doesn't say coal miners. It says visitors of a mine site. And it goes on to say surface hazard training shall be provided by the licensee, meaning Cobol, to visitors exposed to mine surface hazards. Hazard training shall include and then- What was the mine surface? The mining surface hazard he was exposed to was working in this building where there was no suitable anchorage point for him to tie off while on the step ladder. That could have been next to the Kroger store, too, a storage thing. That's not a mine hazard. Well, but it could have been next to a Kroger, but how you would implement the system is specific to the location and to the site. And that's why Kentucky is so adamant that they want the mine who has superior knowledge of how to implement that system. In fact- Yes, but the superior knowledge goes to mining activities, doesn't it? No. No, not at all, Your Honor. In fact- Isn't that what a mine hazard would be? Well, a hazard that's specific to that mine location. I mean, I think Cobol would have you interpret this very narrowly and say this has to be a mine hazard, meaning someone underground with a pickaxe swinging at rock. But that's not what the Kentucky legislature has said. Is there something specific within any of the regulations that would help us? I know you've taken us to 7 colon 090, which does talk about surface hazard training shall be provided to visitors exposed to mine surface hazards. But is there any- Yes. REG defining mine surface hazards? Well, if you look in that regulation, Your Honor, under section 2A, it says hazard recognition and avoidance. And then under C, it differentiates and says mining and mine safety related issues. And so maybe the best evidence of whether if he were hazard trained, it would have included what he was doing, comes from the superintendent of Cobol's mine, who under sworn testimony, Mark Keller testified, had I hazard trained this man, the first question I would have asked him is, what are you doing here at the mine? And then I asked, well, if he told you he was going to be working on a step ladder at an elevated height at that building, what would have happened? He said I would have walked him down there and I would have explained to him how to do it safely and what equipment he would have needed and to make sure that he had that. And then I went on to ask, had he been tied off, as you would have done, do you think it would have made a difference in this case? And he said he would still be with us today. Who provided the ladder? The ladder was provided by H&B builders. Does that make a difference? No, it doesn't, not under the regulation here under 805-3-100. If you look at the plain language of that regulation, it puts the onus on the coal mine to inspect and remove any unsafe equipment and it would be, I believe, subsection 13. And that's why Coval, for this very building, had inspected the man lift, the skid steer, and all of the other equipment used on other days. In fact, Coval has admitted that they should have provided hazard training, they have admitted that they should have inspected that work area, and they have admitted that they should have inspected the equipment that was there that day. And you got workers copped for that. You do, but workers cop exclusivity was shot down by the district court. Well, I mean, all you've talked about is what their negligence was, and good, bad, or indifferent, that's what you get copped for. Well, in the Commonwealth of Kentucky, making a workers cop claim does not exclude, necessarily, bringing a personal injury case. And in fact, they've not raised that issue on this appeal. The district court shot that down correctly. This man was not involved in an activity that was regular and reoccurring to the mine. He was hanging a garage door. However, he was exposed to certain mine-specific hazards, which the Kentucky legislature meant to remedy and protect him against. There's a saying to... The intellectual problem for someone dealing with this for the first time is, how can you say it's a mine-specific hazard when really, if this building had been right here, down the street, the same injury, an accident, could have befallen? That's true, Your Honor. But there's that saying, to whom much is given, much is expected. And the Commonwealth, in their legislative intent, has made a declaration that unregulated surface mines are dangerous, not just to coal miners, but to all people in property of the Commonwealth. And in this case, the supervisor from Evansville Garage Door said, unless he was more than 10 feet off the ground, we didn't have a policy that he should be tied off. We didn't have a policy that the step ladder itself should be tied off to prevent it from moving when struck. Kentucky has made the decision, we're going to put some of that onus on the mines to protect the people and to protect the property. That's a decision Kentucky has made. Should we address the spoliation issue? Absolutely. That is part and parcel with everything about this case. You have a case where a man fell from a step ladder to his death. And within days, Koval knew that there was going to be future litigation. Within a few days after that, you have an investigator from the Work Comp insurance company out there inspecting it, taking pictures, while Mark Keller is watching him do it, and they're discussing how there are deficits and defects with that ladder that predated this incident. And to be clear, this man did not just fall off the ladder. That ladder, there was, the garage door descended, it struck the ladder, the ladder then began to walk, folded together, and then he fell off. How far up was he? He was about 7 feet. Approximately 7 feet. So when did the ladder disappear? We don't know exactly, but it disappeared after, we know this, it disappeared after he was aware future litigation would arise. It disappeared after he had met and spoken with the Work Comp investigator, Mark Keller, the superintendent of the mine. And if we look at the Beaven case, which Judge Moore brought to us and Judge White concurred with, I'm sorry. I wrote it. You did write it. I'm sorry. And Judge White concurred or joined in the opinion. In the Sixth Circuit, the discovery process should be above board, good, bad, ugly, or indifferent, whatever the truth is, preserve evidence and produce it. And every piece of evidence, not just physical evidence, electronically stored evidence, evidence in different people's possession, all cobalt is all gone. None of it has been preserved. None of it has been produced in this case. Not only just from the jurisprudence of this circuit, but also their own document retention policy said they had a duty to preserve the evidence. They have given absolutely no good reason at all ever for failing to preserve or produce that evidence. And without that ladder, how do we know that the cleats on that ladder weren't worn to a point that it contributed to that ladder walking and him falling off? We don't. But you said that the ladder was provided by H&B, not by the mine. That's true. But if we go back to the regulation, Kentucky mine laws put the onus on cobalt to inspect all equipment on the property being used on the property. Even if the equipment is being provided by a subcontractor? Absolutely. Using his own? Absolutely. And in fact, in this case, cobalt inspected other equipment provided by contractors and used at that building during this process. So your position is that if you are the contractor and you bring a defective ladder on, and the whole cause of your accident is your defective ladder, the coal mine is still liable under what section of the provisions? It would be 805KAR3 colon 100. I don't know if I would state my position exactly as you framed it, Your Honor. I was the hypothetical. You know, the way I feel comfortable answering that is, Kentucky mining laws have put an obligation and a duty on cobalt and other mines to inspect property and equipment coming on and being used on mine property. Okay. Tell me what the reg says. I'm sorry? Do you have the reg in front of you? I do, Your Honor. It says, in relevant part, safety standards controlling the use and operation of equipment in the Commonwealth surface-type coal and clay mines. Section 1. The following items shall be guarded to prevent injury. And again, it doesn't say just to coal miners. And then we get down to subsection 13. Unsafe equipment or machinery. What does mines mean in that regard? I'm sorry? What does surface mines mean? Surface mines, which I'm not a mine expert, so to speak, but it would include coal fine recovery, which we have in this case, stripper mines. Mines on the surface. As opposed to underground. Correct, Your Honor. This was tailored specifically for cobalt. Section 1 of 3 colon 100 says, the following items shall be guarded to prevent injury. And there's a list of A through J under my version. But then you're going to 13, which is a different section. Oh, I'm sorry. It's J13. I don't see J having... Okay. You think it's J13. I thought then there's 2, 3. There's J, and then there's 2, 3, 4. No, you're right. Section 113 then. I'm sorry. Kind of confusing here. But 13 simply says, unsafe equipment or machinery shall be removed from service immediately. Absolutely. And this step ladder arguably was unsafe. The fact that they destroyed it knowingly when they had a duty to preserve it, that they knew it was a contested issue in this case. They've hired an expert to say it wasn't unsafe. Before I get to your jury argument, did they... Was this before or after the workers' comp took pictures? After. After. So you had photographs. We have poor quality photographs which show that the cleats on the bottom of the step ladder, which are designed to create traction and prevent the ladder from moving, were worn. We also know that there was a crack in the step ladder. And one of the pictures shows that the spreader... You've got the things you really need. You don't have the instrument, but the adjuster came out and at least made some photographs of it. Your Honor, I disagree. A photograph of this versus having the actual item to have a forensic engineer inspect it and offer opinions that would meet the Daubert standard are two different things. All right, Counselor. Thank you. I see your red light is on. May it please the Court. The factual situation here is that Koval was dealing with an expert. David McCarty was a very experienced garage door installer. Undisputedly, he had installed over 1,000 of these doors. He worked for a reputable company, Evansville Garage Doors in Evansville, Indiana. He had worked for them for many years. I don't think it's unfair to say that Mr. McCarty was the expert on garage door installation. How did he come to use someone else's ladder? We don't know precisely, Your Honor, although there was testimony from his coworker, Jeremy Means, who was there and witnessed the accident, that they had ladders and other equipment on their truck, but just elected not to use the ladders that they had brought. The H&B ladder, there was testimony the H&B step ladder, which is what he was using, was already there at the site. H&B, of course, played a part in constructing other parts of the building. They turned it over to Evansville Garage Doors because of the size and weight of this garage door and because H&B builders were not experts in the installation of that type of door either. So the reasonable thing to do, we think, under those circumstances, is to hire the expert. David McCarty was that expert. But isn't there a basic question whether Koval, as a surface mine entity, has a duty under these Kentucky statutes and regs to inspect equipment of, accepting your position that this is an expert, of an expert who comes on to attach things to a building that's being built on your behalf on the surface of the mine? If Your Honor, please, I'm not aware of a regulation that says to a mine operator in Kentucky, you have a duty to inspect everything that's brought onto your property, whether it's used in mining or not. I'm not aware of such a regulation. And if the plaintiffs were aware of such a regulation, they did not cite it to Judge McKinley because there is no such regulation in the district court's opinion and Judge McKinley carefully reviewed them. What about these regs that your opponent's been talking about in front of us? Yes, ma'am. 805KAR3 colon 100, which is the one there was an exchange about unsafe equipment or machinery shall be removed from service immediately. The official note to that regulation says this. This administrative regulation establishes safety standards controlling the use and operation of equipment in the Commonwealth's surface type coal and clay mines. In the mines. This man was not in a mine. He was in a garage, which as has been pointed out already, could have been anywhere. There was nothing about this garage. But doesn't the definition say, mine means any open pit, all shafts, slopes, drifts, or inclines leading there to, and includes all buildings and equipment above or below the surface of the ground used in connection with the workings. In connection with the workings, that of course relates to an underground mine. It also relates to the workings of producing coal. I know, but this is a place where you're storing the equipment. That relates. That building is used in connection with the workings. You're not some strangers in storing furniture there. Well, two things. Number one, the building was unfinished. It had not been turned over to COVIL. Number two, the equipment had nothing specifically to do with mining. They had tools, hammers, saws, pliers, that sort of thing. It was a tool shed in large part. We're not storing augers and we're not storing mining equipment. Not going to store those things in that building. But there were tools that were going to be used in connection with the mining business. Right? Tools that were going to be used. Well, I guess you have to have saws and so forth. They weren't going to be used for some other business. No, ma'am. There's not another business taking place on the property. It's a coal fine recovery facility. I would also point out, as did Judge McKinley, that 805 K.A.R. 7 colon 090, the key phrase was not emphasized in Mr. Zeiske's reading of it. It talks about visitors exposed to mine surface hazards. That's the hazard training regulation, as your Honor very well noticed. And the whole purpose of these regulations is to provide hazard training for mine hazards. Mr. McCarty didn't fall because of a mine hazard. Another regulation that they've pointed to, 805 K.A.R. 3 colon 020, just basically says you need a foreman there. Not really exactly specific to don't put a ladder underneath a doorway. Why did they investigate this? Why did the mine people investigate this? Why did MSHA investigate it? Yeah. And why did they make any findings if it has nothing to do with mines? With all due respect to MSHA, in the mining business, they're the 800-pound gorilla. They come and they take over and they did the investigation. I would also point out in that connection, they did a very thorough investigation. They reconstructed this accident. It wasn't just that there were work comp adjusters, photographs of the ladder and so forth. MSHA had photographs. MSHA had a video. MSHA interviewed and investigated. Talked to everybody who was there. I'm sorry to ask a basic question. MSHA, is that the federal agency? Yes, ma'am. Yes, ma'am. Yes, ma'am. Is there also Kentucky OSHA? Were they involved? There is the Kentucky Office of Mines and Minerals, but the investigation here was the investigation done by MSHA. I'm sure they shared their findings with the Kentucky Department of Mines, but the investigator was William Barnwell, who is a federal MSHA employee. So I'm curious about the spoliation issue. What does the record show as to when the key evidence, which would include the ladder and the tie-offs or lanyards or harnesses, or you can fill in what are the key pieces, when they disappeared and under whose control they were when they disappeared? There's only a small amount of evidence on that, but it's undisputed. Mark Keller, who was the foreman at the site, was told by MSHA, get rid of that ladder. There was also blood on some of the pieces of physical evidence, obviously for health reasons connected with other totally unrelated topics. But Mark Keller testified unequivocally, I was told, get rid of the ladder, and I did. That was only after MSHA had done the investigation and had instructed him. You know, we've done what we want to do with the ladder. We don't find that anything wrong with the ladder caused this door to come down or caused this man to fall to his death. Can MSHA order destruction of evidence that is likely to be relevant to a federal or state court proceeding? I don't know the answer to that, Your Honor, but I would say that from the standpoint or from the viewpoint of somebody in the mining industry who is regulated very carefully by a federal agency, if I were in Mark Keller's shoes, I'd have done exactly what he did, follow the instructions of MSHA. They certainly have broad discretion in interpreting their own regulations and in deciding what powers and authorities they have. I think it would have been quite risky for Mr. Keller to do otherwise. So what I'm getting from you is that MSHA said to Keller to get rid of the ladder because there was human material. No. No. On the harness and on the lanyard there was proof, I believe, that there was blood on the harness. It was not without risk because of blood. I don't know whether there was specifically evidence of blood on the ladder or not. I suspect not, but I don't know definitively on that. What I do know is Mr. Keller said, no one contradicted this. MSHA told me to get rid of it. But that was after it was determined that the ladder was unsafe, right? Well, I don't think there was a determination that it was unsafe. I think there was a determination that there was a crack, but MSHA obviously believed that the crack didn't have anything to do with the door coming down, hitting the ladder, and this man going off. Right. In other words, an incidental... Get rid of that ladder. I'm sorry? If someone says get rid of that ladder in the context of a workplace, I think it kind of means get the ladder out of the workplace. How did he get rid of it? The record, I think, just says I don't remember exactly what I did with it. I probably threw it on the scrap pile. I don't recall Mr. Keller's precise testimony of that. I'm sorry. But as a neutral third party with considerable expertise, and if there was the slightest question about whether that ladder was unsafe, cracked or not, I'm sure MSHA would have called in other people. They didn't. But it really was a fairly self-explanatory accident because of Mr. Means, who saw it. The ladder was under the doorway. The door was not blocked. This man was not tied off. He broke three basic safety rules. Sometimes even experts take shortcuts. Sometimes even experienced workers break the rules. But if he didn't know how to tie off in this particular environment, and Keller says that's part of his job to tell people, what was he supposed to do? There was testimony he already had been tied off that day. He was not tied off at the time of the accident, but Jeremy Means testified that McCarty had been tied off earlier that day. And Means also warned him shortly before this happened. I see you're untied now. I see you're not hooked. Get hooked up. Get tied off. And that's testimony by Means regarding this job as opposed to some other job somewhere else? Regarding the minutes leading up to the accident and the day that they had spent there, or the half day. He had been tied off before, and Means specifically told him, you better tie off. Is that in our record here? Yes, ma'am. So we just find it in Means' deposition? Yes, ma'am. I'm sorry I don't have the record page site, but I'm sure that it's in our brief. I'm sorry I don't have the record page site at my fingertips. And that, of course, was undisputed. There was also reference in the appellant's brief, and Mr. Seisky referred to it here in his oral argument today. He didn't refer to it by section number, but it's KRS 350.020. This is one that, say the plaintiffs, creates a duty to all persons. Here's the way that statute reads. The General Assembly finds that the Commonwealth is the leading producer of coal, and that the production of coal in Kentucky contributes significantly to the nation's energy needs. The General Assembly further finds that unregulated surface coal mining operations cause soil erosion, damage from rolling stones and overburden, landslides, stream pollution, the accumulation of stagnant water, and so forth. This is an environmental statute. It's not a statute related to how to safely use a ladder at a coal-fine recovery point. It ends, and in general, create hazards dangerous to life and property, so as to constitute an imminent and inordinate peril to the welfare of the Commonwealth. In general, create hazards dangerous to life and property. The situation here is, it's the Mine Act. These are mining regulations, and Mr. McCarty was not a miner. He wasn't doing mining, and he wasn't in a mine when this happened. All he needed to know were those basic safety rules about block the door, don't put the ladder under the doorway, and tie off. That's all he needed to know. So if the door were being installed inside a mine, would McCarty be protected then? Everything else being the same? If it was in an underground mine below the surface? Sure. I don't know, Your Honor, I suppose. Don't you have to say yes? I would certainly think that there would be hazard training not on, you know, how do you install a garage door? He didn't need to know that. He knew that very well. There would be hazard training like don't smoke. Well, it could be like don't smoke or watch out for the air quality. If you see dust, get a respirator or what have you. Things that are mine specific. Thank you. But this, I'm sorry, I'm sure my time is up. It is. Thank you. Thank you very much. May I please the court? Cobol's counsel said that Mr. Means told McCarty, you need to tie off minutes before the incident. It is true. Mr. Means testified to that. But Mr. McCarty did tie off that day when working on the man lift. Mr. McCarty nor did anyone else working from the step ladder, no one ever tied off. In fact, even Mr. Means admitted that he would not himself known how to tie off when working from the step ladder. Evansville garage doors policy said you only have to tie off if you're more than 10 feet above the ground and there was nothing in their policy about securing the top or the bottom of the ladder. Had they provided hazard training to him like they did to me when I visited the mine property and gone over what I was going to be doing that day, Mark Keller, the superintendent of that mine said, I would have walked him out there, showed him how to tie off, how to do the lassos and the wires, and this man would still be with us today. This 10 feet rule, that has no basis in anything? I think it supports our position that Kentucky wants to prevent people from harming themselves by accidents. It's not what I'm asking you. I'm saying they have a rule, you have to tie off if you're higher than 10 feet. Are you saying that that rule is insufficient? It was in this situation, absolutely, without question. Okay. So I would think that that's a pretty common thing. It might be. When you have to tie off. It might be. And you're saying that the 10 foot rule has no basis in industrial safety? Well, I'm not an expert in terms of... Why does somebody fall from 5 feet? Well, I think that's the Kentucky legislature's point, is that we want uniformity. We don't want people coming to mines and implementing their own policies, whether they be deficient or what have you. We want uniformity, and we are going to place some of that onus on the mine to determine when you hazard train if... How is there going to be uniformity if there isn't a mine rule that you have to tie off if you're above a certain number of feet? There is. What's the number of feet? Four feet. In the mine? There's a mine rule? It's Coval's own mine rule. So they made up their own rule? They did, but their mine rules are inspected and approved by MSHA. But another mine might have a different number of feet. It would have to at least meet the minimum standard that MSHA said was okay. Which is what? I don't know. Well, isn't that your job to know? What's that? Isn't that your job to know? It might be, but I know what it was in this case. And in this case, at this mine, and for this case. When I went to the mine, they hazard trained me. They have to hazard train everyone that comes to the mine. That's on the record, is it? Your testimony? No. But I can tell... He gets a chance to cross-examine you if you're going to tell the truth. He would probably enjoy that, Your Honor. But I want to emphasize too here, Mr. McCarty was working under Coval's federal mine ID number. You can't just show up to a mine and start working. You either have to have your own federal mine ID number or work through Coval's. And he was working through Coval's mine ID at the time of this incident. Somewhere I have the impression that Mr. McCarty may have not come in through the main gate and checked in and so forth, but may have come around a back road. Can you tell me whether that impression is correct or not and where I would find the answer? Mr. Means gave us that impression. But Coval has steadfastly denied that, that there is no back entrance to the mine. So one other point I wanted to talk about, about the step ladder. When I cross-examined Mr. Keller about the step ladder and what supposedly MSHA told him to do, he kind of wavered when I said, did they tell you to just get it off the mine property or did they tell you to destroy it? And what he said about it being uncontroverted is not true. H&B builders testified that they called Mr. Keller and wanted the ladder back. They wanted the ladder. It was their ladder. They wanted it back. And Mr. Keller did not give it to them. And your red light is on. Thank you. Thank you for your time. Thank you both for your argument. The case will be submitted.